[No. 13326-5-III.    Division Three.    April 4, 1995.]

PATRICIA ANN GUNSHOWS, ET AL, *Appellants*, v. VANCOUVER TOURS AND TRANSIT, LTD., ET AL, *Defendants*, THE DEPARTMENT OF TRANSPORTATION, *Respondent*.

*Rodney Reinbold* and *Mansfield, Reinbold & Gardner,* for appellants.

*Christine O. Gregoire, Attorney General,* and *John J. Kirschner, Assistant,* for respondent.

THOMPSON, C.J. — Patricia Ann Gunshows, individually and as the personal representative of the Estate of Arlin Henry Gunshows, appeals the Superior Court's summary dismissal of her action against the State of Washington. The action asserted the State was liable for the death of 13-year-old Arlin because it allegedly failed to post adequate speed warning signs to slow traffic at the intersection of SR 97 and Malott Road. Arlin was struck by a tour bus and killed when he failed to stop before crossing the intersection on his bicycle. On appeal, Ms. Gunshows contends the trial court erred when it held the State was not negligent because the signing was sufficient to warn persons using the intersection in a proper manner. She argues the fact children on bicycles frequently crossed the intersection raised an issue as to whether the State had breached its duty of care. We affirm.

On April 29, 1989, Arlin and his cousin Vine Broken Rope decided to ride their bikes to Malott from their homes in a HUD housing development. Their course took them west along Malott Road. A stop sign for traffic on Malott Road is situated at the point where the road intersects with SR 97. Just before the intersection, Arlin's hat blew off and he turned his head to look for it. He did not see a tour bus proceeding north on SR 97, and he failed to stop. The driver of the tour bus slammed on the brakes when he saw Arlin enter the intersection. Unfortunately, it was too late. The bus struck and killed Arlin.

Ms. Gunshows sued the tour company which owned the bus. She subsequently amended her complaint to add the State as a defendant.[1] She alleged the accident was the result of the State failing to post signs slowing traffic on SR 97. Further, the lack of proper signing made the highway inherently dangerous for juvenile bicyclists, who the State knew used the intersection.

The State moved for summary judgment. In support of its motion, the State submitted the declaration of Kern Jacobson, a traffic and highway engineer. He described the sign-

---

[1]Ms. Gunshows settled with the tour company.

ing at the intersection. The road on which Arlin was riding was controlled by a stop sign and a painted stop bar. The tour bus, which was northbound on SR 97, had the benefit of (1) a sign reading "Malott Left $^1/_2$ Mile", (2) a pedestrian ahead warning sign located approximately 530 feet south of the intersection, and (3) a second sign reading "Malott" with an arrow pointing left just south of the intersection. Mr. Jacobson stated the sight distance for someone stopped at the stop bar on Malott Road looking south on SR 97 is 4,350 feet. A sight distance of 582 feet is required by the Washington State Transportation Design Manual. In his opinion, "the signing at this intersection . . . satisfied the Manual On Uniform Traffic Control Devices and was in compliance with all applicable traffic and highway engineering standards. . . . [A]dditional warning signs . . . were not warranted."

In response, Ms. Gunshows filed the affidavit of Ronald O. Carlson, who has investigated over 100 accidents as a reconstruction expert. In his opinion, "[a]t a speed limit of 55 m.p.h. and given appropriate time for reaction, it would be impossible for a northbound vehicle traveling at the speed limit . . . to stop for a bicycle who approaches and crosses the intersection at 10 m.p.h. without a stop."[2] He therefore concluded the road speed is not safe for ordinary use, which includes use by juvenile bicyclists who are prone to disregard stop signs. He stated his opinion that "[a] bus traveling 45 mph would have stopped before impact with a comfortable margin."

Ms. Gunshows also submitted the affidavit of Don Bleakney, whom she asked to investigate the bicycle use patterns of the HUD housing development. He stated that there are 37 houses in the development, and that all commercial vending facilities are located on the other side of SR 97. The

---

[2]Mr. Carlson also was of the opinion Arlin did not travel across the roadway at a uniform speed of 10 m.p.h. "This is clear from the fact that the bus driver saw Arlin Gunshows in time to apply his brakes leaving a substantial 318 foot skid mark." He estimated the speed of the bus at the time the driver saw Arlin to be 70 m.p.h. "[A] bus driver traveling 55 mph would have seen Arlin Gunshows at the same point in his travel as the bus driver in this case . . .", and would have been able to stop short of impact.

housing development has a large ratio of children to adults. He observed 29 bicycles parked on property adjacent to 19 of the 37 homes. A door to door canvass revealed 31 bicycle riders between the ages of 4 and 18. The owner of the Malott store confirmed that many of his customers are juvenile bicyclists who come from the housing development across SR 97.

In addition, Ms. Gunshows filed the affidavit of Eric Thompson, a clinical psychologist employed by the United States Public Health Service, with offices in Winthrop, Washington. Referring to the crossing, he stated: "I cannot think of a more dangerous situation anywhere else in the County."

Despite Ms. Gunshows' arguments that the above evidence raised an issue of fact, the court granted the State's motion for summary judgment.

On appeal, Ms. Gunshows contends the court erred when it held as a matter of law that the State's duty was limited to keeping the highway reasonably safe for persons using it in a proper manner and exercising ordinary care for their own safety. Specifically, she maintains the State should have foreseen that child bicyclists would fail to stop at the stop sign; that the posted speed limit and signing did not allow for child avoidance; and that application of the standard used by the trial court violates the statutory provision for comparative negligence.

The cornerstone of Ms. Gunshows' argument is former WPI 140.01 and the comment thereto. The pattern instruction advises that the State has a duty to exercise ordinary care in the design of its public roads to keep them in a manner that is "reasonably safe for ordinary travel". The committee deleted the qualification found in the instruction as it appeared prior to the adoption in Washington of comparative negligence, *i.e.*, that the public highways be reasonably safe for "persons using them in a proper manner and exercising ordinary care for their own safety". WPI 140.01 cmt. (quoting *Argus v. Peter Kiewit Sons' Co.*, 49 Wn.2d 853, 307 P.2d 261 (1957)). The committee stated it

believed this qualification did not apply "since contributory negligence is not now a bar to recovery". Cmt., at 632.

However, the 1994 pocket part to the WPI contains a revised WPI 140.01, which includes the previously deleted qualification. The comment explains that the committee's position as set forth above "has been rejected in several cases decided after the enactment of comparative negligence". *See* WPI 140.01, at 137 (Supp. 1994). It cites *Hansen v. Washington Natural Gas Co.*, 95 Wn.2d 773, 632 P.2d 504 (1981) and *McKee v. Edmonds*, 54 Wn. App. 265, 773 P.2d 434 (1989).

In *Hansen*, the plaintiff jaywalked, slipped, and fell on a plank placed in the street to cover an excavation. The court affirmed the trial court, which had entered a judgment notwithstanding a verdict in favor of the plaintiff. *Hansen*, at 778. The court held that "[t]he adoption of comparative negligence does not create a new liability where none previously existed. Rather, recovery is now permitted where it was previously denied *after liability has been established.*" (Italics ours.) *Hansen*, at 778. The court reasoned: "The adoption of comparative negligence does not enhance duty. It merely removes the bar to recovery when the plaintiff has been negligent." *Hansen*, at 778.

In *McKee*, the plaintiff tripped in a pothole while jaywalking. She contended jaywalking was customary and foreseeable in that area. Thus, the City owed her a duty to make it safe for pedestrian travel. The court rejected this argument, observing *Hansen* "implicitly held that, even if jaywalking was foreseeable, there was 'no duty . . . to make the middle of the street, mid-block, safe for pedestrians who might elect to leave the sidewalk . . . and angle *illegally* across the street'". *McKee*, at 267 (quoting *Hansen*, at 778). *See also Walker v. State*, 67 Wn. App. 611, 617, 837 P.2d 1023 (1992), *rev'd on other grounds*, 121 Wn.2d 214, 848 P.2d 721 (1993).

Most recently, in *Ruff v. County of King*, 125 Wn.2d 697, 705, 887 P.2d 886 (1995), the Supreme Court observed the County's duty to maintain a roadway in a reasonably safe condition "does [not] require a county to 'anticipate and protect against all imaginable acts of negligent drivers' for to do

so would make a county an insurer against all such acts".
*Ruff*, at 705 (quoting *Stewart v. State*, 92 Wn.2d 285, 299,
597 P.2d 101 (1979).

■ Likewise, the State's duty here is not determined by
the alleged foreseeability of Arlin's negligence. The issue is
whether the State breached its duty to maintain the road-
way in a reasonably safe condition for people exercising
ordinary care for their own safety.

■ Ms. Gunshows appears to argue the State owes a dif-
ferent duty to children. She relies upon cases which evalu-
ate whether *a child is negligent* by comparing his conduct to
that of a reasonable child of similar age, intelligence, matu-
rity, training, and experience. *See, e.g., Bauman v. Crawford*,
104 Wn.2d 241, 245-47, 704 P.2d 1181 (1985). Their analysis
is not helpful here because the question of the child's
negligence never arises if the plaintiff fails to first establish
the State breached a duty owed.

Ms. Gunshows also cites *Berglund v. Spokane Cy.*, 4 Wn.2d
309, 321, 103 P.2d 355 (1940). There, the court held that if
the County could reasonably anticipate the negligence of
drivers on a bridge which was also designed for and used by
pedestrians, it had a duty to protect pedestrians from the
resulting danger. Negligence by the pedestrian was not at
issue. Unlike Arlin, the pedestrian in *Berglund* was using
the bridge in a proper manner exercising ordinary care.

We hold summary judgment was properly granted the
State. There was no reasonable dispute as to whether Arlin
was using the intersection in the proper manner, exercising
ordinary care for his own safety. He was not. In these cir-
cumstances, the State did not breach its duty of care.

Affirmed.

Munson and Schultheis, JJ., concur.